## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

ANNA SCHOENBACH, *et al.*,

        Plaintiffs,

        v.

DISTRICT OF COLUMBIA, *et al.*,

        Defendants.

C.A. No. 05-1591 (RMC)

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, plaintiffs respectfully request that this Court enter summary judgment in their favor. The grounds for this motion appear in the accompanying memorandum of points and authorities.

WHEREFORE, plaintiffs respectfully request that this motion be granted.

Respectfully submitted,

/s/ (filed electronically)
Michael J. Eig        #912733

/s/ (filed electronically)
Haylie M. Iseman #471891

MICHAEL J. EIG AND ASSOCIATES, P.C.
5454 Wisconsin Avenue, Suite 760
Chevy Chase, Maryland 20815
(301) 657-1740

Counsel for Anna Schoenbach and her parents

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANNA SCHOENBACH, *et al.*, | |
| Plaintiffs, | |
| v. | C.A. No. 05-1591 (RMC) |
| DISTRICT OF COLUMBIA, *et al.*, | |
| Defendants. | |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFFS'  MOTION FOR SUMMARY JUDGMENT**

**I.    INTRODUCTION.**

Anna Schoenbach is a fifteen-year-old disabled child, who is entitled, under the

Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§1400, *et seq*.,[1] to receive

special education and related services from defendants, District of Columbia Public Schools

("DCPS" or "the school system").  Anna and her parents, Andrew Schoenbach and Daryl Kade,

brought this action in response to the defendants' failure to provide her with the free appropriate

public education ("FAPE") and due process of law to which she is entitled under the IDEA.

Through an administrative appeal, the parents sought the remedy of a non-public

placement at The Nora School ("Nora") for the 2005-06 school year, where Anna could receive

all of her special education services in a setting appropriate to meet her needs.  This action is an

---

[1]    The Individuals With Disabilities Education Improvement Act of 2004 took effect on July 1, 2005.  However, the administrative appeal here was decided under the 1997 Act; all IDEA references cited herein are to the 1997 Act, and references to the federal regulations which have not yet been re-promulgated, are to those which interpret the 1997 Act.

appeal of a decision of an Impartial Hearing Officer,[2] who uncountably ignored the overwhelming and one-sided evidence and the weight of the law, determined that DCPS offered Anna an appropriate special education program and placement, and therefore denied family their requested relief.

In so holding, the Hearing Officer committed a myriad of critical errors, including: (1) ignoring compelling expert testimony and evidence regarding Anna's need for a therapeutic program that offers full-time specialized instruction in a full-time mainstream setting; (2) ignoring similar and comprehensive evidence regarding the inappropriateness of the DCPS proposed placement at McKinley Technology High School ("McKinley"); (3) improperly disregarding the uncontested and dispositive fact that Nora is a less restrictive placement than McKinley; (4) refusing to admit into evidence compelling written testimony by Anna's therapist, despite the fact that it was submitted as part of a supplemental disclosure five business days in advance of the second hearing date on June 14, 2005; and (5) assigning the parents the burden of proving that the school system's proposed program and placement were inappropriate for Anna, when law in the District places the burden on DCPS to prove that the proposal was appropriate. The clear result of theses multiple violations of the IDEA was a denial of a free and appropriate education to Anna Schoenbach.

As there are no material facts in dispute and plaintiffs are entitled to judgment as a matter of law, plaintiffs respectfully request that this Court enter summary judgment in their favor, and provide them with the much-delayed relief to which they are entitled.

---

[2]     Impartial Hearing Officer Terry Michael Banks decided the administrative case, in *Anna Schoenbach v. District of Columbia Public Schools*, (July 11, 2005).  Citations to this determination will hereafter appear as "Hearing Officer's Decision at __."

## II.   FACTUAL BACKGROUND.

Anna Schoenbach, born on February 1, 1991, is an exceptionally bright fifteen-year-old child with Asperger's Syndrome, a high-functioning Autism-spectrum disorder, Attention Deficit Hyperactivity Disorder, inattentive type ("ADHD"), and associated executive functioning disabilities. Though her cognitive ability, as measured by IQ testing, is in the superior range, her disabilities greatly impact Anna's ability to succeed in school. Because of these disabilities, Anna requires special education and related services. Complaint ¶¶6 and 7; Answer ¶¶6 and 7.

During the 2004-05 school year, Anna was placed and funded by DCPS at the Kingsbury Day School ("Kingsbury"). She attended Kingsbury for the 2004-05 school year and received educational benefit from that placement. Complaint ¶8; Answer ¶8. Over the course of the school year, Anna's needs evolved to the point where she required a less restrictive environment for her education. Complaint ¶9; Answer ¶9; July 14, 2005 Tr. at 67.[3] In a letter dated January 19, 2005, counsel for the parents informed DCPS of Anna's changing needs and requested that DCPS begin the process to change Anna's placement for the following school year. Complaint ¶10; Answer ¶10.

After much research into available programs, the Schoenbachs and Anna's long-term therapist concluded that Nora was an appropriate placement for her. In the January 19, 2005 letter, they informed DCPS that they were seriously considering a placement at Nora for the

---

[3]     This citation is to the transcript of the Administrative Hearing, which took place on May 6, 2005 and July 14, 2005. All references thereto will be cited as "[date] Tr. at __." It should be noted that on page 11 of the May 6, 2005 transcript there is an incorrect reference to the Miller School in the last paragraph. The "Nora School" should be substituted for the "Miller School". May 6, 2005 Tr. at 11.

2005-06 school year.  Complaint ¶11; Answer ¶11; AS-2 ;[4] July 14, 2005 Tr. at 69-70.  When

DCPS failed to respond to this letter over a period of two months, on March 24, 2005, the

Schoenbachs requested a Due Process hearing under the IDEA.  The DCPS Student Hearing

Office scheduled a hearing for May 6, 2005.  Complaint ¶12; Answer ¶12.

      DCPS failed to contact the parents to propose a date to meet and discuss a change in

placement or make any other communication with the parents until April 11, 2005, *after* the Due

Process hearing had already been scheduled.  Complaint ¶13; May 6, 2005 Tr. at 44.  On April

29, 2005 – just one week before the Due Process hearing was scheduled to occur and almost

three months after the parents asked for a new placement – the Multi-Disciplinary Team

("MDT") convened to discuss Anna's program for the 2005-06 school year.  Complaint ¶14;

Answer ¶14; Hearing Officer's Decision at 5.  At that MDT meeting, members discussed the

substantial progress Anna had made over the past year.   Then, <u>against</u> <u>the</u> <u>judgment</u> <u>of</u> <u>all</u> <u>other</u>

<u>MDT</u> <u>members</u>, the DCPS representative proposed a contemplated, but not existing, Asperger's

program at McKinley as Anna's placement for the 2005-06 school year.  Complaint ¶15; May 6,

2005 Tr. at 48-50; Hearing Officer's Decision at 5.  Anna's psychologist at Kingsbury for over

two years, Dr. Kara Covington, expressed her strong disagreement with the proposed placement.

She stated that, being familiar with McKinley's layout and the size of the student body, she was

certain that Anna would be overwhelmed and set up for failure in such a large school setting.

Complaint ¶17; Answer ¶17; Hearing Officer's Decision at 4-5.  She further stated that "she

---

[4]    These citations are to the numbered exhibits contained in the administrative record.
Throughout the administrative proceedings and herein, plaintiffs' exhibits are referred to as "AS-
__ " and defendants' exhibits are referred to as "DCPS-__."

needs a small setting," and that if sent to McKinley, "we would be doing her a disservice; the social pressure would be too much." *See* DCPS-2.

At the MDT meeting, DCPS was not able to provide any detailed information about the McKinley Asperger's program. Instead, the DCPS representatives referred the parents to the McKinley website. However, this website also did not contain any information about the Asperger's program. Complaint ¶16; DCPS-2; May 6, 2005 Tr. at 100. The paucity of information provided by DCPS about the McKinley Asperger's program made it very difficult for the Schoenbachs to determine the appropriateness of the program for Anna. Complaint ¶18.

Despite these roadblocks and the school system's extensive delays, the Schoenbachs researched the proposed placement to the best of their abilities. Complaint ¶19; On May 3, 2005, Anna's mother spoke on the telephone with McKinley's Special Education Coordinator, Lawrencia Cole-Brown. Ms. Kade found Ms. Cole-Brown to be a likable administrator and teacher who seemed to care about her job. However, Ms. Cole-Brown admitted that she had only learned of the new Asperger's program at McKinley *that same day* and that she was accordingly unable to provide many details about the nature or structure of the program. Complaint ¶20; Answer ¶20.

The very next day, May 4, 2005, the Schoenbachs and Dr. Covington visited McKinley and spent three hours touring the school and meeting both regular education and special education teachers. The parents were impressed by the apparent dedication and enthusiasm of the McKinley staff. However, they concluded that the imposing size and layout of the school campus and the large student population would overwhelm Anna, and that she would shut down in such an environment and become isolated. Complaint ¶18; Answer ¶21; July 14, 2005 Tr. at

5

85-87. Furthermore, both Dr. Covington and Dr. Lisa Gilotty, Anna's private psychologist, advised that Anna would be unable to benefit academically and socially from either the self-contained highly restrictive Asperger's classes or the overly large inclusion classes available at McKinley. Complaint ¶22; Answer ¶22; AS-8. The proposed program for Anna at McKinley is a significantly more restrictive placement than Nora, where Anna can receive individualized full-time specialized instruction throughout the day in a full-time mainstream setting. Complaint ¶23; June 14, 2005 Tr. at 83-84 and 90.

Because the Schoenbachs were convinced that the McKinley program could not meet Anna's academic and social-emotional needs, and because they desired a less restrictive but specialized (individualized) academic environment, they rejected the DCPS proposed placement at McKinley. Complaint ¶24; June 14, 2005 Tr. at 85-87.

A Due Process hearing convened just two days later, on May 6, 2005, before Hearing Officer Terry Banks, and continued on June 14, 2005. Complaint ¶25; Answer ¶25. It is of particular note that this hearing occurred just 5 business days after the April 29, 2005 MDT meeting.

In a decision dated July 11, 2005, the Hearing Officer determined that the parents were not entitled to placement and funding of Anna at Nora, based on a finding that DCPS offered Anna a program calculated to provide her educational benefit. Complaint ¶30; Hearing Officer's Decision at 9. The Hearing Officer also ruled that, even if McKinley was found to be an *inappropriate* placement, the Schoenbachs would not be entitled to reimbursement for a placement at Nora because Nora does not offer special education services. Complaint ¶31; Hearing Officer's Decision at 7-8.

### III.    SUMMARY JUDGMENT IN FAVOR OF THE PLAINTIFFS IS APPROPRIATE.

In order for summary judgment to be appropriate, a party must demonstrate that there are no facts in dispute and that one party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  An issue of fact is considered to be "genuine" if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In the context of the IDEA, a federal court must give "due weight to the findings of the local and state educational agencies even though it must also make an independent decision based upon a preponderance of the evidence."  *Hendrick Hudson Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176, 205-06 (1982).  The primary source of evidence in an IDEA case should come from the administrative hearing, and the administrative proceedings must not be considered a dry run for protracted litigation in federal court.  *Springer v. Fairfax County Sch. Bd.*, 134 F. 3d 659, 667 (4th Cir. 1997); *Burlington Sch. Comm. v. Department of Educ.,* 471 U.S. 359 (1985), *aff'g Town of Burlington v. Department of Educ. for the Commonwealth of Mass.*, 736 F.2d 773 (1st Cir. 1984).

Although a hearing officer's findings of fact are considered *prima facie* correct, the Court is required to make an independent decision based upon the preponderance of the evidence, giving due weight to the *regularly made* findings of fact at the administrative level.  *Doyle v. Arlington County Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991)(emphasis supplied).  However, where findings are not regularly made, or the application of the law to the facts is erroneous, the decision does not merit deference.  *Teague Independent School Dist. v. Todd L.*, 999 F.2d 127, 131 (5th Cir. 1993).

Such is the situation presently before the Court.  The evidence and arguments that the Schoenbachs set forth clearly demonstrate that the Hearing Officer disregarded relevant, reliable evidence and testimony, and that he erroneously applied the law to the facts.  Thus, the normal deference to the Hearing Officer's findings and conclusions is not warranted.  As plaintiffs demonstrate, the Hearing Officer's legal conclusion that DCPS made an appropriate placement proposal for the 2005-06 school year is so inconsistent with the facts that those facts cannot be termed "regularly made."

### A.    The Correct Inquiry Requires a Review of the Entire Record.

The correct judicial inquiry in IDEA cases, unlike in actions based on other administrative decisions, requires deferential, but independent examination of the entire record, and then a decision rendered based on the preponderance of the evidence.  The IDEA instructs that district courts, upon hearing an action brought for review of administrative proceedings, "*shall receive the records of the administrative proceedings, shall hear additional evidence* at the request of a party, and, *basing its decision on the preponderance of the evidence*, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(e)(2) (emphasis added).  Thus, "judicial review in IDEA cases differs substantially from judicial review of other agency actions, in which courts generally are confined to the administrative record and are held to a highly deferential standard."  *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467 (9th Cir. 1993); *see also, Heather S. v. State of Wisconsin*, 125 F.3d 1045, 1052 (7th Cir. 1997) (holding that "[t]he standard of review under which this court considers [the student's] challenge differs from that governing the typical review of summary judgment."); *Hunger v. Leininger*, 15 F.3d 664, 669 (7th Cir. 1994), *cert. denied*, 513 U.S. 839 (1994) (holding that "[t]he motion for summary judgment

8

is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record.").  It has been well established that in IDEA cases, the Court's review is bound by no such limitations to an inclusive review.

The Supreme Court has also recognized this Court's mandate to consider more than merely the evidence now before the Court.  "Congress intended courts to make bounded, independent decisions -- bounded by the administrative record and additional evidence, and independent by virtue of being based on a preponderance of the evidence before the court." *Burlington*, 736 F.2d at 791; *see also, Sanger v. Montgomery County Bd. of Educ.*, 916 F. Supp. 518 (D. Md. 1996) (holding, "The district court, however, may consider the entire record developed below as well as any additional evidence presented in the district court itself."). Instead of considering solely the facts that both parties have specifically pleaded, the Court must also make a "bounded" decision by reviewing and weighing the entire administrative record, and then make an "independent" decision based on a preponderance of the evidence.

As is clear from a review of the record here, this greater review in IDEA appeals is critical if Anna is ever to have her rights afforded her. The Hearing Officer disregarded relevant, reliable evidence and testimony, and then compounded that error by erroneously applying the law to the facts.  The evidence and testimony were clear that DCPS failed on both a procedural and substantive level to provide Anna with a FAPE.  The Hearing Officer, on the other hand ignored this uncontroverted testimony and the clear and compelling evidence before him.  The scope of evidence in the administrative record demonstrates that the Hearing Officer issued a badly-flawed decision and that there are compelling reasons to issue judgment for the plaintiffs.

**B.    The Court Must Give a Lesser Degree of Deference to IDEA Administrative Decisions Than to Other Administrative Decisions.**

In its review of the administrative record, a district court is not required to accord absolute deference to the decision of the Hearing Officer. While the Court does afford "due weight" to the administrative decision, "the [Court must [also] independently evaluate" the facts contained in the administrative record, from both witnesses' testimony and evidence. *Heather S.*, 125 F.3d at 1053. Thus, it would be improper to accept as unassailable either the factual findings in the administrative decision, or the decision itself. Rather, before determining whether factual disputes exist, a proper analysis must first consider all of the evidence. Only then can the Court make a determination of whether the Hearing Officer erred in his decision, or departed from the normal decision-making process. Should this Court determine that the Hearing Officer did make findings of fact or a decision in error, the Court should not accord the decision any deference.[5] These are, in fact the circumstances in the present case.

---

[5]    In *Springer*, 134 F.3d 659, the Fourth Circuit clarified the standard of deference to administrative decisions first set forth in *Doyle*, 953 F.2d 100. The *Springer* Court refused for several reasons to give deference to the administrative decision. Where an administrative decision "turn[s] on" "the weight to be given the [parents'] evidence," the administrative decision "has no special claim to deference." Thus, the Court held a determination of the weight to afford evidence requires an independent inquiry from that made at the administrative level. *Id.* at 663.

Also, the *Springer* Court noted that, where the administrative decision in *Doyle* warranted deference since it contained a detailed explanation of the result, it is appropriate to afford substantially less deference to an administrative decision which is "both cursory and conclusory." *Id.* Plaintiffs here note that the Hearing Officer erred in applying the law to the facts about Anna's needs, and thus without explanation arrived at a baseless legal conclusion. This Court therefore need only supply a rationale for a holding which departs from the administrative decision. *Id.*

The Fifth Circuit has considered the amount of deference which is due to an administrative fact finder, and has expressly rejected the argument that the administrative decision is entitled to such a strong presumption of correctness as to negate the need for additional evidence or a thorough review.  The Court held:

> Although the district court is directed by the statute to give the [ALJ's factual] findings "due weight," the statute does not state that the district court must defer to those findings when its own review of the evidence indicates that [the administrative fact finder] erroneously assessed the facts or erroneously applied the law to the facts.

*Teague*, 999 F.2d at 131 (citations omitted) (citing *Rowley*, 458 U.S. at 206); *see also, Tice v. Botetourt County Sch. Bd.*, 908 F.2d 1200 (4th Cir. 1990); *Hudson v. Wilson*, 828 F.2d 1059 (4th Cir. 1987);  *Board of Educ. of Community Consol. Sch. Dist. 21 v. Illinois State Bd. of Educ.*, 938 F.2d 712, 716 (7th Cir. 1991), *cert. denied*, 502 U.S. 1066 (1992).  This holding instructs that courts need not recognize administrative decisions as *prima facie* correct, but need only allow these decisions a degree of significance proportionate to the magnitude and relevance of the rest of the evidence.  Thus, it is clear that this Court must evaluate *all* of the evidence to determine whether the Hearing Officer's factual findings are correct, and whether the Hearing Officer properly applied the law to these facts.

## IV. THE HEARING OFFICER ERRED BY MISALLOCATING THE BURDEN OF PROOF.

Under 5 D.C.M.R. § 3022.16, "The D.C. Public Schools shall bear the burden of proof, based solely upon the evidence and testimony presented at the hearing, that the action or proposed placement is adequate to meet the educational needs of the student."  This Court has historically held that DCPS bears the burden of proof in all administrative hearings, including those concerning the eligibility of a child for special education services under the IDEA.  *Kroot*

11

*v. District of Columbia*, 800 F. Supp. 976, 982 (D.D.C. 1992) (explaining 5 D.C.M.R. § 3022.16).

DCPS bore the burden of proof on *all* issues before the Hearing Officer. The precursor to *Kroot, Mills v. Board of Educ. of Washington, D.C.*, 348 F. Supp. 866 (D.D.C. 1972), precipitated the passage of the Education for All Handicapped Children Act of 1975 (now the IDEA), and found that constitutional principals of due process and equal protection necessitated the District bearing the burden of proof as to all facts concerning the appropriateness of any placement, denial of placement or transfer. By that reasoning, DCPS also bears the burden of proving that the converse is true of the parent's unilateral placement. Though DCPS did not meet this burden, the Hearing Officer seemed not to notice.

It is quite apparent that DCPS did not meet its burden of proof in this case. Defendants failed to present, through testimony or evidence, any specifics about the McKinley program and how or why it would be appropriate to meet Anna's needs. At the time of the hearing, the program was not yet fully developed.[6] In fact, DCPS had just *one* student enrolled in the program, and had not yet hired the special education teacher or the aide. July 14, 2005 Tr. at 21-22 and 42. In addition, the witnesses who did testify, including Ms. Cole-Brown, the special education coordinator at McKinley, were clearly confused as to how the program was going to be implemented and whether an inclusion model would be utilized. July 14, 2005 Tr. at 47-51.

The Hearing Officer ignored defendants' failure to prove all issues before him. In conducting his analysis, he erroneously placed the burden of proof on the Schoenbachs, requiring

---

[6]     Victoria Williams, DCPS Coordinator of City-Wide Autism Programs, testified at the July 14, 2005 hearing that the decision to create the program at McKinley had been made "a couple weeks ago." July 14, 2005 Tr. at 100.

them to prove both that the McKinley program was inappropriate for Anna and that Nora could

meet her needs.  Even with this misplaced burden, it is impossible to conceive of how DCPS

could have demonstrated an appropriate placement to meet this burden when it proposed *a non-*

*existing placement* for Anna, followed by witnesses who did know the student, and therefore

offered *no real evidence* of how the program could meet Anna's needs.  Thus, DCPS

unquestionably did not meet its statutory burden.  Further, though the Schoenbachs did not bear

the burden, they nevertheless showed, through evidence and testimony that McKinley is

inappropriate and that Nora is the only appropriate placement for Anna.  The Hearing Officer

offered no explanation for how DCPS could possibly have met its statutory burden.  For this

reason, the resulting decision was a travesty of Due Process.

## V.    THE HEARING OFFICER'S FINDINGS OF FACT AND CONCLUSIONS OF LAW WERE CONTRARY TO THE LAW AND EVIDENCE.

The presumption of correctness traditionally due to the Hearing Officer's findings is

easily overcome by the facts in this administrative record, which are well-documented and were

supported before the Hearing Officer by unchallenged, unimpeached testimony and written

evidence.  No reasonable trier of fact could have found as did this Hearing Officer, given the

facts and the law.  The Hearing Officer's complete disregard for the facts in the record

establishes the basis of his erroneous denial of funding to Anna and her family.

### A.    The Hearing Officer Erred in Failing to Recognize that the School System Violated the Schoenbachs' Procedural Rights By Denying Them Meaningful Participation in the IEP Meeting.

The Supreme Court has held that the right to a FAPE under the IDEA is comprised of two

equal parts, due process of law and a substantively adequate IEP.  "First, has the [educational

agency] complied with the procedures set forth in the Act, and second, is the individualized education program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 206-07.  Anna has been deprived of a FAPE under both sets of circumstances.  First, the school system denied the Schoenbachs the opportunity to participate in a meaningful way at the last-minute April 29, 2005 IEP meeting and second, the school system failed to offer an appropriate placement for Anna.

Historically, federal courts have held that "failures to meet the Act's procedural requirements are adequate grounds by themselves for holding that a school board has failed to provide [the student] with a FAPE."  *Board of Educ. of Cabell County v. Dienelt*, 843 F.2d 813, 815 (4th Cir. 1988) (*quoting Hall v. Vance*, 774 F.2d 629, 635 (4th Cir. 1985); *see also, Hudson*, 828 F.2d at 1063 (holding that "procedural noncompliance can itself support a finding that a child has not been provided with a FAPE"); *Gerstmyer v. Howard County Pub. Sch.*, 850 F. Supp. 361, 364-5 (D. Md. 1994); *Reusch v. Fountain*, 872 F. Supp. 1421 (D. Md. 1994).

It is also true that federal courts do draw a distinction between minor procedural violations that do not effect the provision of free, appropriate educational services to the student, and violations that interfere with such a provision, or as in Anna's case, completely thwart it. *See Gadsby v. Grasmick*, 109 F.2d 940, 956 (4th Cir. 1997).  Courts have generally considered the issue of procedural violations from the prospective of the impact of the school system's failures. In *Sanger*,  916 F. Supp. 518, the district court held that, "to the extent that there may be failure to comply strictly with the IDEA's procedures, the Court must consider whether the failures have caused a loss of 'educational opportunity' or are merely technical in nature.  *Burke County Bd. of Educ. v. Denton*, 895 F.2d 973, 982 (4th Cir. 1990)."

14

Here, there can be no question as to the adverse educational impact of the school system's failure to adequately propose a program and placement for Anna.  On April 29, 2005 the IEP team convened to review Anna's educational progress and to determine an appropriate placement for the 2005-06 school year.[7]   The team discussed Anna's unique needs and the various aspects of two programs on the table (McKinley and Nora), the team reached a consensus – that based on Anna's needs, McKinley would be highly inappropriate and that the most appropriate placement for Anna would be at Nora.  At the Due Process Hearing, Ms. Berry, DCPS placement specialist, testified about the IEP meeting and the group consensus:

> Q:    The consensus of the group at the IEP meeting was, clearly, that [Anna]
>        should go to Nora, right?
> A:    Yes.
> . . .
> Q:    The only person in that meeting that thought that the IEP could be appropriately
>        implemented in the Asperger program at McKinley was you, correct?
> A:    Yes, the local education [representative].

Testimony of Cathy Berry, May 6, 2005 Tr. at 48 and 55-56.[8]  Despite this unquestionable "consensus," DCPS ignored the team's recommendation and continued to propose placing Anna at McKinley.

---

[7]    The team consisted of a number of teachers and service providers from Kingsbury Day School, as well as Anna's parents, and two representatives from DCPS, including Cathy Berry, DCPS placement specialist.  *See* DCPS 2.

[8]    It should also be noted that at the time of her testimony, Cathy Berry did not know Anna personally and had never observed her or spoken to her parents about her specific needs.  May 6, 2005 Tr. at 42-45.  The rest of the team, with the exception of the attorneys, were extremely familiar with Anna and had worked with her on a daily or weekly basis during the 2004-05 school year.  *McKenzie v. Smith*, 771 F.2d 1527, (D.C. Cir. 1985).

The Office of Special Education Programs ("OSEP") of the Department of Education, which administers the IDEA,[9] has considered the "public agency's responsibility if it is not possible to reach consensus on what services should be included in a child's IEP[.]"  This agency interprets the federal regulations to require that:

> The IEP meeting serves as a communication vehicle between parents and school personnel, and enables them, as equal participants, to make joint, informed decisions regarding the (1) child's needs and appropriate goals; (2) extent to which the child will be involved and participate in the regular education environment and State and district-wide assessments; and (3) services needed to support that involvement and participation and to achieve agreed-upon goals. *Parents are considered equal partners with school personnel in making these decisions*, and the IEP team must consider the parents' concerns and the information that they provide regarding their child in developing, reviewing, and revising IEPs (§§ 300.343(c)(iii) and 300.346(a)(1) and (b)).
>
> *The IEP team should work toward consensus*, but the public agency has ultimate responsibility to ensure that the IEP includes the services that the child needs in order to receive FAPE.  It is not appropriate to make IEP decisions based upon a majority "vote."  If the team cannot reach consensus, the public agency must provide the parents with prior written notice of the agency's proposals or refusals, or both, regarding the child's educational program, and the parents have the right to seek resolution of any disagreements by initiating an impartial due process hearing.

34 C.F.R. Part 300, Appendix A - Notice of Interpretations on IEPs, 64 Fed. Reg.12,473 (1999) (emphasis added).

In enacting the IDEA, Congress certainly anticipated that schools may, at times, refuse to make placements based on the requests of the parents.  *Brown v. Bartholomew Consolidated Sch. Corp.,* 2005 WL 552194 at 5 (S.D. Ind. 2005).  These refusals do not contravene the

---

[9]    While OSEP interpretations are not law, courts will typically afford them dispositive deference absent a compelling reason to do otherwise.  Since the interpretations cited herein are entirely consistent with the IDEA and regulations, they provide valuable guidance to discern what was required of the Schoenbach family and the school system during the IEP process.

purpose of the statute as long as school officials consider different views of parents and their experts. *Id.*  The law requires that placement decision be "made by a group of persons including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options . . . ."  34 C.F.R. § 300.552(a)(1).  In the case of Anna, however, the school officials involved failed to consider the views of her parents and the experts at the IEP meeting and did so blatantly and without any decent explanation.  *See* DCPS 2.  When asked why she did not implement the group consensus, Cathy Berry's sole response was, "Because I've never been in a meeting with Kingsberry [sic] where they've supported a public placement." May 6, 2005 Tr. at 54.  Despite the detailed discussion and subsequent consensus on this issue, Cathy Berry ignored the team and continued to propose McKinley.  By failing to *consider* the opinions of the team and formalize what she, herself, termed the consensus of the IEP meeting, Ms. Berry and DCPS directly and substantially violated the procedural protections set forth in the IDEA.[10]

There is no rational conclusion from these facts other than that DCPS determined the McKinley placement prior to the IEP meeting, without the input of the parents or their experts. This pre-determination is supported by the fact that prior to the meeting, Ms. Berry's only knowledge of Anna was based on a year-old IEP – yet she continued to propose McKinley, despite the plethora of evidence as to its inappropriateness by those who knew Anna well and understood her current needs.  Such an *ex parte* decision as to placement, or predetermination, has been found to be a direct violation of the parents' procedural rights.

---

[10]     At no time did the school system offer to visit or observe Nora in order to gain a better understanding of the program.

For example, in *Spielberg v. Henrico County Pub. Sch.*, 858 F.2d 256, 258-259 (4th Cir 1988) the Fourth Circuit found that the school district violated the parents' procedural rights when it decided to change the student's placement before holding the meeting. The Sixth Circuit reached a similar decision in *Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840 (6th Cir 2004), finding that, "The District Court erred in assuming that merely because the Deals were present and spoke at the various IEP meetings, they were afforded adequate opportunity to participate. Participation must be more than a mere form; it must be *meaningful*." *Deal,* 392 F.3d at 858 (*citing W.G. v. Board of Trustees of Target Range School District No 23*, 960 F.2d 1479, 1485 (9th Cir 1992)).

The testimony presented and notes taken at the IEP meeting on April 29, 2005 make it clear that DCPS and Ms. Berry pre-determined the placement of McKinley for Anna, and, moreover, violated the consensus of the IEP team. Similar to the situation confronted by the parents *Deal*, the IEP notes reveal that while the Schoenbachs and their experts were present and allowed to speak at the meeting, their participation was not meaningful and had no effect on the DCPS placement decision. By failing to even consider the opinions of those involved, DCPS violated the parents' procedural rights and in turn, denied Anna a FAPE.

**B.    The Hearing Officer Erred In Failing to Admit Compelling Written Testimony As Part of Supplemental Disclosure.**

Five business days prior to the start of the July 14, 2005 hearing date, the Schoenbachs, through counsel, submitted supplemental five-day disclosure. In this disclosure, the parents included a School Consultation from Dr. Gilotty, Anna's psychologist of two years, who at the time was the Program Director for the Children's National Medical Center, Center for Autism

Spectrum Disorders (a copy of the document is attached to this Motion as "Exhibit 1").  The letter/report includes compelling information regarding Anna's specific needs as they relate to both Nora and McKinley.  This document was submitted under the IDEA and the DC Municipal Regulations which provide that, "[a]t least five business days prior to the hearing, each party shall disclose to all other parties all evaluations completed by that date and recommendations based on the offering party's evaluations that the party intends to use at the hearing." 5 D.C.M.R. § 3031.2; 20 U.S.C. § 1415(f)(2)(A).  The DC Municipal Regulations specify that a party to a hearing may "[p]rohibit the introduction of any evidence at the hearing that has not been disclosed to all parties at least five business days before the hearing."  5 D.C.M.R. § 3031.1(c).[11] At the hearing, DCPS objected to the School Consultation arguing that because it was not submitted at the April 29, 2005 MDT meeting and was created after the start of the hearing on May 6, 2005, it was inadmissible.  The Hearing Officer sustained the objection.

The Schoenbachs requested that Dr. Gilotty write the letter (which is dated May 31, 2005) in order to provide others with an expert opinion as to Anna and the school options.  Dr. Gilotty has been working with Anna for over two years and was therefore able to provide insight into Anna and her potential reaction to both Nora and McKinley.  It was impossible for the letter to be presented at the April 29, 2005 MDT meeting, as counsel for DCPS suggested at the hearing, because **the letter did not exist at that time**.  In fact, it was not until the April 29th MDT

---

[11]    See 34 C.F.R. § 300.509(b)(1), which requires: "At least 5 business days prior to a hearing conducted pursuant to Sec. 300.507(a), each party shall disclose to all other parties all evaluations completed by that date and recommendations based on the offering party's evaluations that the party intends to use at the hearing."  Further, under § 300.509(a)(3), any party to a hearing has the right to, "Prohibit the introduction of any evidence at the hearing that has not been disclosed to that party at least 5 business days before the hearing . . . ."

meeting – *which ended in the late afternoon, five business days before the start of the hearing and the same date that disclosure was due for the May 6, 2005 hearing date* – that DCPS even identified the (as-yet-only-imagined) McKinley program, and it was not until May 3rd and 4th that the parents were able to learn enough about the program to adequately understand it and request Dr. Gilotty's opinion.  It was thus literally impossible for Dr. Gilotty to have written any letter that could have been submitted before the five-day disclosure due date, and it was virtually impossible for her to have received the information, adequately researched the proposed placement and made a well-informed decision regarding her opinion of McKinley versus Nora in time for the May 6th hearing itself.  Nor could the parents have disclosed Dr. Gilotty as a witness for the May 6th hearing since DCPS had made no indication that they would be proposing McKinley or challenging Nora until the April 29th meeting, despite having had months since the parents had requested a change in placement.[12]  Had DCPS scheduled an IEP meeting when the Schoenbachs made their original request for a change of services, as required by the law, this problem would not have occurred.  DCPS delayed this process and has now penalized the parents for its own mistake.

---

[12]    Further, it should be noted that the DCPS IEP and prior notice for the McKinley placement both of which were developed on April 29, 2005, were disclosed **after close of business** on that date.  Technically this disclosure was late and should not have been considered at the hearing.  However, the information and documents were entered into evidence and considered by the Hearing Officer.  As such, the hearing that had initially been set up to challenge the school system's failure to respond to the parents request turned into a hearing about the appropriateness of the school system's last-minute placement proposal.

This evidence should never have been permitted.  Under 5 D.C.M.R. §§ 3031.1(c) and .2 or under 34 C.F.R. §§ 300.509(b)(1) and (a)(3).  Since the evidence did not exist prior to the May 6, 2005 hearing, DCPS could never have timely disclosed it, and the Hearing Officer should have permitted the parents to prohibit its introduction.

20

The Court should consider this additional evidence, which is merely a written embodiment of the information that the DCPS members of the MDT team should have considered, and that the Hearing Officer should have considered at the Due Process Hearing. According to the IDEA, courts may consider additional evidence to supplement the administrative record in a variety of cases, including the "improper exclusion of evidence by the administrative agency." *Justin G. v. Bd. of Educ. of Montgomery County*, 148 F.Supp.2d 576, 585 (D.Md. 2001) *citing*, *Burlington*, 736 F.2d at 790. *See also*, 20 U.S.C. § 1415(e)(2). Further, the consideration of this evidence should give the Court a more complete picture of the specifics of the case. *Justin G.,* 148 F. Supp.2d at 585. Because this letter was wrongly excluded and because it offers important information to any finder of fact, it should now be admitted and given the appropriate weight, further indicating the utter folly of placing Anna at McKinley.

**C.    The Hearing Officer Erred in Finding that the School System Proposed an Appropriate Placement for Anna.**

The IDEA requires that children with disabilities be educated "to the maximum extent appropriate" with children without disabilities. This requirement of the IDEA, also known as the least restrictive environment ("LRE") requirement, reveals a strong congressional preference for mainstreaming. 20 U.S.C. § 1412(a)(5); 20 U.S.C. § 1412(a)(2). The Fourth Circuit has stated that "mainstreaming of handicapped children into regular school programs where they might have opportunities to study and to socialize with nonhandicapped children is not only a laudable goal but is also a requirement of the Act." *Devries by DeBlaay v. Fairfax County Sch. Bd.,* 882 F.2d 876, 878 (4th Cir. 1989). While this strong preference does exist, the IDEA also recognizes that some students are in need of separate classes or more restrictive settings to gain educational

benefit.  20 U.S.C. § 1412(a)(5); 34 C.F.R. § 300.550.  The key is to place the student in the LRE where he/she will receive educational benefit.

Anna's parents, her therapist, and her teachers all agree that she needs a small, general education school setting with an individualized curriculum that can challenge her academically.[13] *See* The School Consultation by Lisa Gilotty, PhD, (Exhibit 1).[14]  The only identified appropriate placement for Anna is Nora, a small mainstream private school in Silver Spring, Maryland that offers a college preparatory setting with classrooms of 5-12 students.  While Nora does not offer a traditional special education program, the school is prepared to offer Anna a number of accommodations, as well as a specialized education, to meet her educational needs.  Anna will be part of a regular class and will have the opportunity to learn and socialize with other students on a daily basis.  Nora's small class sizes, specialized instruction, and available accommodations make it a highly appropriate fit for Anna.  *See* AS-9.

On the other hand, DCPS has proposed a new Asperger's Program at McKinley High School for Anna for the 2005-06 school year.[15]  According to the limited information DCPS

---

[13]    Anna is a very bright student with a high verbal IQ and average non-verbal IQ.  She demonstrates deficits in attention and organization skills across several measures of executive functioning.  She also has significant social-emotional weaknesses including a tendency to "shut down" in situations which she finds overwhelming.  Anna has worked hard to build up her self confidence and now desires to be in a high school where she can increase her social independence and be challenged academically.  One of Anna's goals is to attend college, so a college-oriented curriculum is essential.  *See* Exhibit 1.

[14]    This document was not admitted into evidence at the hearing due to a sustained objection. See Section IV.B of this Motion for more discussion on this point.

[15]    As previously mentioned, the 2005-06 school year will be the first year for the Asperger's Program at McKinley.  This program has not existed at any other DCPS school.  No written material or information about the program was available at the time of the hearing.

provided to the parents, the program is to consist of students of mixed grades, all diagnosed with Asperger's Syndrome or related disabilities, who will receive special education instruction in a self-contained classroom with up to six other students. *See* DCPS 2.  These students will be supported by a special education teacher, as well as two aides.  *See* DCPS 2.  Students will be provided with access to the general curriculum via mainstream classes on a limited basis based on their abilities and needs.  Inclusion classes will have 15-22 students and will be co-taught by a regular subject teacher and a special educator.  *See* DCPS 2.

For a number of clear reasons, McKinley cannot meet Anna's needs.  The self-contained portions of the program are highly inappropriate and far too restrictive.  Anna is in need of academic stimulation from high level teachers in specific subject areas, as well as interaction with peers with whom she can develop relationships.  *See* Exhibit 1.  Anna should <u>not</u> be in a program designed primarily for students with Asperger's.  *See* Exhibit 1.  This will have detrimental effects on her educational and social development and could lead to a damaged self esteem and depression.  *See* Exhibit 1.  Even more inappropriate for Anna than the self-contained aspect of McKinley, is the inclusion portion.  McKinley projects that over the next two years, the high school will expand to 800 students, making it impossible for Anna to navigate around the school or eat lunch in the cafeteria without the assistance of an aide.  *See* Exhibit 1.  Anna cannot feel comfortable in classrooms with 15-22 students.  In addition to feeling overwhelmed, the general education teachers will not have the time to provide Anna with the specialized and flexible instruction she needs.  *See* Exhibit 1.  Anna needs small classes with students of similar intellectual ability and teachers that can support her – something McKinley cannot offer.

At the hearing, Ds. Covington, Anna's psycho-therapist at Kingsbury, testified about the inappropriateness of the program at McKinley. Specifically, she stated that, "the McKinley structure itself, just the building, would be overwhelming for her, and . . . she would regress if she were placed in that type of large building." July 14, 2005 Tr. at 62. She spoke at length about Anna's desire to interact with other students and her need to be in a "therapeutic setting, where she could develop those skills." July 14, 2005 Tr. at 67. Dr. Covington concluded by stating that McKinley would not appropriate and that Anna would "face overload if she goes to that placement." July 14, 2005 Tr. at 73.

DCPS witness Ms. Cole-Brown confirmed these concerns in her testimony about a Learning Disabled/Emotional Disabled student currently attending McKinley who had come from a smaller school environment similar to Kingsbury. She testified:

> He has had some difficulties dealing with . . . being in a classroom where there are so many students and two teachers . . . he has not been as successful as we would have hoped. Like right now, he stays with me all day. I give him his work. We go to lunch together, because right now he is just not ready to be in the regular population. . . . we lunch together instead of him going into the cafeteria with the other students.

July 14, 2005 Tr. at 36-38. Remarkably, despite this clear case study by DCPS' own witness that supported the exact contentions of the parents, Dr. Covington, and other members of the Kingsbury IEP team (including Dr. Gilotty) about the adverse impact of McKinley's size, and with no offsetting examples of success or explanation, the Hearing Officer ignored all of the testimony and determined that McKinley was an appropriate placement.

Under the clear requirements set forth in the IDEA, Anna must attend the school that offers her the least restrictive environment, while still providing her with educational benefit.

24

There can be no question that the specialized education and small class size at Nora makes it the best equipped to fulfill these requirements. The school system's proposed program at McKinley cannot meet Anna's unique needs and in fact, as indicated by the expert testimony and example of the child at McKinley, could do serious harm and reverse the substantial progress made during her years at Kingsbury. Under the LRE requirements of the IDEA, Anna must attend Nora and the Hearing Officer was overtly wrong to find otherwise.

### D.     The Hearing Officer Erred in Giving Complete Deference to the School System Witnesses.

The Hearing Officer's decision makes it clear that without valid reason or explanation, he gave absolute deference to the opinions of the DCPS witnesses, while actually ignoring the parents' witnesses. The IDEA does intend to give a degree of deference to the opinions of those experts in the school system, but the IDEA never intended this deference to be absolute. "In considering the evidence, the reviewing court must give 'due weight' to the expertise of the school officials responsible for providing the child's education. However, where there is no indication that the school officials' expertise has been brought to bear on the individual needs of the handicapped child, the deference granted will be commensurately lower." *McKenzie v. Smith*, 771 F.2d 1527, 1535 n.17 (D.C. Cir. 1985) (*quoting Rowley*, 458 U.S. at 206).

By this reasoning, a school system's proposed special education services are not entitled to special consideration merely because school system employees are expected to have expertise with regard to *each and every* student. Where such expertise is remiss, no deference is warranted. "To prescribe deference to [the school system's] witnesses would defeat the purpose of an impartial due process hearing and dilute to the point of meaninglessness the Act's

procedural protections of children with disabilities and their parents." *Board of Educ. v. Brie R.*,
C.A. No. AW-98-3161 (D. Md., Memorandum Opinion at 17, June 30, 1999).

It is important to consider that the DCPS witnesses and those who support Anna's
placement at McKinley have never even met her.  Anna is a student with unique needs that only
those who have worked with her can fully comprehend.  It is merely common sense that this
Court should give more deference to the opinions of Dr. Covington and Dr. Gilloty and the other
individuals who have responded to Anna's needs and figured out how to successfully address
them, than to the opinions of the DCPS educators who have no idea who Anna is and how to
appropriately educate her.  It would be patently unreasonable to do otherwise.

### E.  When a Student Has Been Denied FAPE, the Funding of a "Proper" Parental Placement Is the Appropriate Relief.

Under established Supreme Court law, the school system's failure to provide Anna a
FAPE leads directly to the determination of whether her parents have identified a placement that
provided her with educational benefit.  The proper analysis in such an inquiry is found in
*Burlington,* 471 U.S. 359 and *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7 (1993),
*aff'g* 950 F.2d 156 (4th Cir. 1991).

In *Burlington*, the Supreme Court explained that "parents who disagree with the proposed
[educational program] are faced with a choice: go along with the [proposed program] to the
detriment of their child if it turns out to be inappropriate or pay for what they consider to be the
appropriate placement."  471 U.S. at 370.  To avoid compromising a child's right to a FAPE, the
Court concluded that if  "a court determined that a private placement desired by the parents was
*proper* under the Act and that [a proposed] placement in a public school was inappropriate," the

26

IDEA authorizes "retroactive reimbursement to parents." *Id.* (emphasis added).  This result is necessary because "[t]he Act was intended to give handicapped children both an appropriate education and a free one; it should not be interpreted to defeat one or the other of those objectives." *Id.*

In *Carter*, the Supreme Court reaffirmed its ruling in *Burlington* and explained that "public educational authorities who want to avoid reimbursing parents for the private education of a disabled child can do one of two things: give the child a free appropriate public education in a public setting, or place the child in an appropriate private setting of the State's choice."  510 U.S. at 13.  Here, however, since DCPS failed to proposed an appropriate program for Anna and denied this family their due process rights, the inquiry must turn to whether her placement at Nora was "proper."

  F.  **Nora is a Proper Placement for Anna and The Hearing Officer Erred in Finding its "Non-Certified" Status to Be a Deterrent to Placement.**

The Hearing Officer found that DCPS offered Anna a program appropriate to meet her needs.  In so holding, he stated that even if McKinley were inappropriate, he could not have ordered DCPS to place and fund Anna at Nora because it does not offer special education services.  Nora is a private school which has not been certified as a state-approved special education school.  This alone does not make it an improper placement.  A school's lack of special education certification does not prevent a child from being placed there if that school is proper in the other ways.  A "[p]arents' failure to select a state-approved program in favor of an unapproved option does not itself bar reimbursement" *Carter*, 510 U.S. at 8.

The Supreme Court in *Carter* specifically considered whether "parents are barred from reimbursement because the private school in which [their child is] enrolled did not meet the [IDEA] definition of a 'free appropriate public education.'" 510 U.S. at 13. The Court held "that they are not, because [the IDEA's] requirements cannot be read as applying to parental placements." Thus, any determination of Anna's placement at Nora with the supplemental services must apply this more lenient standard of "properness." *Id.; See also, Werner v. Clarkstown Central Sch. Dist.,* 363 F. Supp. 2d 656, 600 (S.D.N.Y. 2005) (stating that the private school need not employ certified special education teachers, or have its own IEP for the student, but it must address the student's special education needs).

Under the standards set forth in *Carter*, Nora is a proper placement for Anna. It is not a certified special education school; however, it is the LRE and is willing and able to address Anna's special education needs. *See* AS-9. All these factors make Nora the proper placement for Anna. It should be noted at the time of this submission Anna has completed her first two quarters at Nora and is doing superbly. She made the school honor roll for both quarters, and received straight A's in six fully acreditted classes. *See* Grade History and Teacher Comments from Nora (a copy of the documents are attached to this Motion as "Exhibit 2"). Anna is socializing well, has friends, and is so comfortable with the school environment that she is able interact with her friends and feel like a normal teenager.

This information regarding Anna's current progress at Nora is additional evidence which this Court is able to consider under the IDEA, 20 U.S.C. § 1415(e)(2) to supplement the administrative record. The reasons for supplementation vary, but include, ". . . evidence concerning the relevant events occurring subsequent to the administrative hearing." *Justin G.,*

148 F.Supp.2d at 585 *citing*, *Burlington*, 736 F.2d at 790.  *See also Ash v. Lake Oswego Sch. Dist. No. 7J*, 766 F.Supp 852 (D.Or. 1991).  Anna's parents placed her at Nora at the start of the 2005-06 school year, *after the administrative hearing.*  This information regarding her progress at Nora was therefore not available at the time of the hearing.  Under the standards set forth for additional evidence, this Court should consider Anna' progress which further indicates that Nora is the only appropriate placement for Anna.

## VI.  CONCLUSION.

Since the Hearing Officer failed to order the appropriate remedy for defendants' violations of the IDEA, this Court should correct his error and order DCPS to place and fund Anna at Nora for the 2005-06 school year, as her current educational placement.  Because there are no material facts in dispute and because plaintiffs are entitled to judgment as a matter of law, plaintiffs respectfully request that this Court enter summary judgment against defendants, that the Hearing Officer's order be reversed, and that defendants be ordered to reimburse plaintiffs for the expenses incurred in enrolling Anna at Nora and providing related services for the 2005-06 school year, with costs and attorneys' fees.

Respectfully submitted,

/s/ (filed electronically)

Michael J. Eig          #912733

/s/ (filed electronically)

Haylie M. Iseman       #471891

MICHAEL J. EIG AND ASSOCIATES, P.C.

29

5454 Wisconsin Avenue, Suite 760

Chevy Chase, Maryland 20815

(301) 657-1740

Counsel for Anna Schoenbach and her parents

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANNA SCHOENBACH, *et al.*, | |
| Plaintiffs, | |
| v. | C.A. No. 05-1591 (RMC) |
| DISTRICT OF COLUMBIA, *et al.*, | |
| Defendants. | |

**ORDER**

Upon consideration of the plaintiffs' motion for summary judgment, along with the related pleadings and any opposition thereto, it is the finding of the Court that the facts are not in dispute, that the plaintiffs are entitled to judgment as a matter of law, and it is by the Court, this _____ day of _____, 2006, hereby

ORDERED, that plaintiffs' motion for summary judgment be and the same is hereby GRANTED; and it is

FURTHER ORDERED, that the administrative decision is reversed, and it is

FURTHER ORDERED, that defendants are to reimburse the plaintiffs for the costs incurred in enrolling Anna Schoenbach at The Nora School, with related services, retroactive to the start of the 2005-06 school year, with attorneys' fees and costs.

_____

United States District Judge